UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

BRENT CRUCETA,

                              Plaintiff,             **FIRST AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL**

     -v-

THE CITY OF NEW YORK; New York City Police     **10-CV-5059 (FB) (JO)**
Department Officer ("P.O.") JASON GUZMAN (Shield
No. 8490), Detective ("DET.") JUAN QUANTANILLA
(Shield No. 7064), SUPERVISORY OFFICER RICHARD
ROE (the name Richard Roe being fictitious, as the true
name and shield number of said person is not currently
known to plaintiff), in their individual and official
capacities,

                              Defendants.

-----------------------------------------------------------------------x

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the Fourth and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, and pendant claims through the Constitution and laws of the State of New York.

2. Plaintiff BRENT CRUCETA's rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis seized, detained, arrested and used gratuitous, unlawful force against the plaintiff. By reason of defendants' actions, including their unreasonable and unlawful use of force, plaintiff was deprived of his constitutional rights.

3. Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the Constitution of the United States.

5. Pursuant to New York State General Obligations Law § 50-G, the plaintiff filed a timely Notice of Claim with the New York City Comptroller on or about August 6, 2010, within ninety (90) days of the events herein complained of. Thus, this Court has supplemental jurisdiction over plaintiff's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6. Plaintiff's claim has not been adjusted by the New York City Comptroller's Office.

7. Venue is proper pursuant to 28 U.S.C. § 1391 in that plaintiff's claim arose in the Eastern District of New York.

8. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

9. Plaintiff BRENT CRUCETA is, and was at all times relevant to this action, a resident of the State of New York and the County of Kings.

10. Defendant, THE CITY OF NEW YORK ("CITY"), is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by NYPD.

2

11. Defendants New York City Police Department Officer ("P.O.") JASON GUZMAN (Shield No. 8490), Detective ("DET.") JUAN QUANTANILLA (Shield No. 7064), and SUPERVISORY OFFICER RICHARD ROE (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD. The individual defendants are being sued herein in their individual and official capacities.

12. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

13. Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for plaintiff's rights.

14. At all relevant times, the defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

15. Plaintiff BRENT CRUCETA is, and was at all times relevant herein, twenty (20) years old and a student at Bushwick Community High School ("BCHS").

16. According to the New York City Department of Education website, BCHS "serves 17-21 year olds who have not met with success in high school and wish to continue their education

and earn a diploma.  BCHS creates a culture of high expectations through a caring and disciplined environment, personal bonds of trust and respect for students.  The curriculum focuses on social justice and emphasizes the importance of college.  BCHS actively seeks to help students transform their lives and the communities in which they live."[1]

17. Since BCHS is a New York City public school, students at Bushwick Community High School are entitled to all of the privileges and benefits that attach to other students of New York City's public schools.

18. Accordingly, BCHS students are eligible to receive reduced-fare MetroCards to use the New York City's subways and buses (herein referred to as "Student MetroCard").

19. According to a website of the New York City Department of Education, Student MetroCards are "[g]ood for travel to and from school and school-related activities between 5:30 a.m. and 8:30 p.m., only on days when the student's school is in session."[2]

20. Student MetroCards are also "[g]ood for three trips each school day. Three trips allows a student to travel to school, from school to an after school activity, and then from that activity to home. A special four-trip [S]tudent MetroCard is available at the principal's discretion."[3]

21. Since plaintiff was a BCHS student and was otherwise eligible to possess and use a Student MetroCard, plaintiff legally possessed a Student MetroCard for use in accordance with its terms at all times relevant herein.

22. The events described herein occurred in Kings County in the vicinity of the Myrtle Avenue and Wyckoff Avenue subway station on June 8, 2010 at approximately 4:30 P.M.

---

[1]      *See*, New York City Department of Education – Bushwick Community High School, available at http://schools.nyc.gov/ ChoicesEnrollment/High/Directory/school/?sid=1416.

[2]      *See*, Student Metro-Cards – Parent Resources – New York City Department of Education, available at http://schools.nyc.gov/Offices/Transportation/ParentResources/StudentMetroCards/default.htm.

[3]      *Id*.

23. At approximately the time and mentioned described above, plaintiff left BCHS and entered the subway station for the "L" train at Myrtle Avenue and Wyckoff Avenue in the Bushwick neighborhood of Brooklyn.

24. Plaintiff swiped his Student MetroCard at the turnstile and entered the subway system.

25. After plaintiff swiped his Student MetroCard, defendant P.O. GUZMAN approached plaintiff and asked for both his identification and his MetroCard.

26. Defendant P.O. GUZMAN asked plaintiff, in sum and substance, where he had received his MetroCard.

27. Plaintiff replied, in sum and substance, that his school issued the MetroCard to plaintiff.

28. As the above-described conversation was ongoing, defendant P.O. GUZMAN began moving plaintiff towards a corner of the train station and continued questioning the plaintiff.

29. Soon thereafter, defendant DET. QUANTANILLA rushed towards plaintiff and defendant P.O. GUZMAN.

30. Without warning, explanation or justification, defendant DET. QUANTANILLA grabbed plaintiff and slammed his head into the wall.

31. Defendant P.O. GUZMAN was in close proximity to plaintiff and defendant DET. QUANTANILLA when this use of force occurred, and he was in a position to prevent defendant DET. QUANTANILLA from using said force.  However, defendant P.O. GUZMAN chose not to intervene to protect plaintiff from defendant DET. QUANTANILLA's attack.

32. As a result of the collision between plaintiff's head and the wall, plaintiff immediately lost consciousness and collapsed.

33. Upon information and belief, plaintiff was transported by ambulance to Wyckoff Heights Medical Center at some point after he lost consciousness.

34. Several hours after defendant DET. QUANTANILLA slammed plaintiff's head into the wall, plaintiff woke up and regained consciousness inside a hospital room at Wyckoff Heights Medical Center.

35. Once plaintiff had regained consciousness, medical staff informed plaintiff that he had a seizure as a result of the collision between plaintiff's head and the wall.

36. Upon information and belief, plaintiff indeed did suffer from at least one (1) seizure when he was unconscious.

37. Soon thereafter, plaintiff noticed he was in a substantial amount of pain around his jaw. Upon inspection, plaintiff realized that one (1) of his teeth had been broken in the above-referenced attack by defendant DET. QUANTANILLA.

38. Plaintiff was hospitalized in police custody for approximately three (3) days.

39. During that time, plaintiff was continually handcuffed and subjected to painful and humiliating leg shackles for the duration of his stay.

40. Plaintiff was kept in NYPD custody for several days, causing plaintiff to endure humiliating conditions of confinement.

41. For instance, on his first night in the hospital, each of plaintiff's wrists were handcuffed to opposite sides of the bed such that his arms were "spread eagle," causing pain, embarrassment and humiliation.

42. The manner and use of the shackles upon CITY officers/employees was in contravention of the consent decree in <u>Reynolds v. Sielaff</u>, No. 81-CV-107 (PNL) (S.D.N.Y. October 1, 1990)

(class action consent decree limiting use of shackles upon medically ill inmate-patients in municipal hospitals) (herein, "the consent decree").

43. In particular, CITY officers/employees violated paragraph "85," subsections (b) through (h) of the consent decree, inclusive, by "routinely" using two-point shackles upon plaintiff while in his bed, by applying shackles without conducting "a review of the inmate's medical condition and security status," and by refusing to follow or seek recommendations from plaintiff's doctors concerning the need for shackles to be used.

44. CITY officers/employees also violated paragraph "89" of the consent decree by keeping plaintiff's ankles shackled together while he took a shower, exposing him to great risk of harm.

45. The conduct of these CITY officers and employees, in violating the terms of the consent decree, caused plaintiff to become profoundly depressed, which in turn caused him to frequently cry while restrained to his bed.

46. Plaintiff was discharged from the hospital on June 11, 2010.

47. From the hospital, police officers took plaintiff to a precinct near the Broadway Junction train station and placed him in a holding cell.

48. At some point while he was in the holding cell, plaintiff began experiencing chest pains.

49. In response to his requests for medical attention, an ambulance was called to the precinct so that plaintiff could be evaluated.

50. Later that day, plaintiff was transported to Queens Central Booking.

51. Plaintiff was charged with violating P.L. §§ 165.15(3) and 205.30, theft of services and resisting arrest.

52. Based upon a supporting deposition signed by defendant P.O. GUZMAN, plaintiff was charged on docket number 2010-QN-10635007 with the above-mentioned violations of the New York Penal Law.  The factual allegations of the accusatory instrument read as follows:

> Deponent is informed by Police Officer Guzman, Shield Number 8490 from City-wide Task Force Kings, that… said officer did observe the defendants, Brent Curceta [*sic*] enter a New York City subway station without paying the lawful fare by using Student MetroCard 1964311550 which was issued for the exclusive use of another not the defendant.  Defendant's age is 20.  Deponent is further informed by said officer that said officer is a legal custodian of the New York City Transit Authority (NYCTA) and said subway system and that the defendant did not have permission or authority to enter or remain in said subway station without paying the lawful fare.
>
> Deponent [is] further informed that the defendant resisted arrest by holding his arms close to his body and attempting to wal [*sic*] away during arrest.

53. Defendant P.O. GUZMAN knowingly and maliciously swore to the truth of such allegations despite knowing these allegations to be untrue and despite knowing that swearing to such allegations would lead to the initiation of criminal charges against the plaintiff.

54. At the initial appearance in criminal court, plaintiff was offered an adjournment in contemplation of dismissal ("ACD"), which plaintiff accepted.

55. At approximately 10:00 A.M. on June 11, 2010, plaintiff was released from defendants' custody.

56. In sum, plaintiff was wrongfully detained for approximately sixty-six (66) hours.

### FIRST CLAIM
### DEPRIVATION OF RIGHTS
### UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. §1983

57. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

58. Defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. § 1983, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

   a. Freedom from unreasonable seizure of his person, including the excessive use of force;

   b. Freedom from arrest without probable cause;

   c. Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

   d. Freedom from the lodging of false charges against him by police officers;

   e. Freedom from having police officers fabricate evidence against him;

   f. Freedom from abuse of process;

   g. Freedom from deprivation of liberty without due process of law; and

   h. The enjoyment of equal protection, privileges and immunities under the laws.

59. Defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. §1983

60. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

61. By failing to remedy the wrongs committed by his or her subordinates, and in failing to properly train, screen, supervise, or discipline his or her subordinates, defendant SUPERVISORY OFFICER RICHARD ROE caused damage and injury in violation of

plaintiff's rights guaranteed under 42 U.S.C. §1983, and the United States Constitution, including its Fourth and Fourteenth Amendments.

62. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### THIRD CLAIM
### FAILURE TO INTERVENE – FOURTH AMENDMENT – 42 U.S.C. § 1983

63. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

64. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

65. Defendant P.O. GUZMAN was present for the above-described incident and witnessed defendant DET. QUANTANILLA unlawfully arrest the plaintiff.

66. Defendant DET. QUANTANILLA's use of force against plaintiff was obviously excessive and unjustified under the circumstances yet defendant P.O. GUZMAN failed to take any action or make any effort to intervene, halt or protect the plaintiff from being subjected to excessive force by other individual defendants.

67. The arrest of plaintiff and the initiation of criminal charges against him was clearly without probable cause or other legal justification, and was based on facts alleged by defendant P.O. GUZMAN which defendant DET. QUANTANILLA knew to be false, yet defendant DET. QUANTANILLA failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested and prosecuted.

68. Defendants P.O. GUZMAN and DET. QUANTANILLA's violations of plaintiff's constitutional rights by failing to intervene in other defendants' clearly unconstitutional use of force and plaintiff's unconstitutional arrest resulted in the injuries and damages set forth above.

**FOURTH CLAIM**
**_MONELL_ CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983**

69. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

70. All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to overlapping policies and practices of the CITY OF NEW YORK which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

71. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

72. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

73. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a.  Using excessive force on individuals without adequate cause or provocation;

   b.  Arresting persons known to be innocent in order to meet "productivity goals" (*i.e.*, arrest quotas);

c. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

    i. in order to protect other officers; and/or

    ii. in order to meet said productivity goals;

d. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

e. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

f. Retaliating against officers who report police misconduct; and

g. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

74. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

a. *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

b. *Lotorto v. City of New York*, 10-CV-1223 (ILG) (JMA) (E.D.N.Y.) (police officers beat, arrest and destroy a video recording of a bystander who was recording an arrest occurring in public);

c. *Zabala v. City of New York*, 3771/2010 (Sup. Ct., Kings Co.) (police officers severely beat and TASER a compliant, prone, bloodied and semi-conscious suspect after he had surrendered);

d. *Long v. City of New York*, 09-CV-9216 (AKH) (S.D.N.Y.); *People v. Pogan*, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, *to wit*, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

e.  *Lin v. City of New York*, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence);[4]

f.  *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on *Iqbal/Twombly* grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

g.  *Callaghan v. City of New York*, 07-CV-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct);[5]

h.  *Carmody v. City of New York*, 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

i.  *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j.  *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

---

[4]     For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

[5]     For a description of this case and the nearly $1 million settlement, *see* Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

k.  *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

l.  *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

m.  *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n.  *Dotson v. City of New York*, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

o.  *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

p.  *Richardson v. City of New York*, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

q.  *Barry v. New York City Police Department*, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

r.  *Taylor v. City of New York*, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as *Richardson*, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

s.  *Walton v. Safir*, 99-CV-4430 (AKH), 122 F.Supp.2d 466 (S.D.N.Y. 2000) (factual findings after trial that a 12-year veteran of NYPD was terminated in retaliation for criticizing the racially-motivated policies of the NYPD's Street Crime Unit and for alleging that such policies led to the NYPD shooting death of Amadou Diallo);

t.  *White-Ruiz v. The City of New York*, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

u.  *Ariza v. City of New York*, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of

both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

v. *Sorlucco v. New York City Police Department*, 89-CV-7225 (CCH), 88 F.2d 4 (2d Cir. 1989) (former officer entitled to trial on issue of whether she was re-assigned and then terminated after reporting that a fellow officer had raped her); and

w. *Kaufman v. City of New York*, 87-CV-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

75. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a. As reported by the media on January 20, 2006 and again on March 2, 2010, Deputy Commissioner Paul J. Browne admitted that commanders are permitted to set "productivity goals."[6]

b. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month.  P.O. Polanco's allegations were confirmed by an audiotape obtained by the media.  The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, *to wit*, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing.  You're gong (sic) to be doing a lot more, a lot more than what they're saying."  The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[7]

c. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing."  The officer explained that they needed to meet quotas.[8]

---

[6]    Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[7]    *Id.*

[8]    Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_ m7iRAd9b4E9alYPuGvy5OO.

d. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[9]

e. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[10]

76. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, *inter alia*, by the following:

---

[9]     *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

[10]     Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[11]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New York*, 09 Civ. 00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[12]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[13]   When it does, however, Police Commissioner KELLY controls

---

[11]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[12]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[13]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated

whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s).  Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions."  Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008.  Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[14]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007.  Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[15]

77. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*, by the following:

    a.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[16]
>
> […]

---

complaints is due in part to the above-noted *de facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[14]    Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[15]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[16]    Mollen Commission Report, p. 36.

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful.  As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets.  This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that?  They're guilty."[17]

b. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel.  The suspect was released.[18]  Moreover,

Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

That's a significant increase over previous years, sources said.
"In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[19]

---

[17]    Mollen Commission Report, pp. 40-41.

[18]    Murray Weiss, *NYPD in a Liar Storm*, New York Post, October 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

[19]    *Id.*

c.   In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel.  Mr. Kim was convicted of those offenses.  The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids."   The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest.  According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[20]

d.   In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau.  As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

---

[20]      John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[21]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[22]

e. In early 2010, the CITY recently settled a civil rights lawsuit wherein one Officer Sean Spencer [23] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000.  In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."  According to the attorney for the Patrolmen's Benevolent Association, disciplinary charges against the officer are pending.[24]

f. Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports.  District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[25]

78. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, *inter alia*, by the following:

---

[21]     Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, available at http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[22]     John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[23]     In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[24]     *Id*.

[25]     David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

    a.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

79. The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner KELLY.

80. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Commissioner Raymond KELLY ("KELLY") who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious

prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

81. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the right:

    a. Freedom from unreasonable seizure of his person, including the excessive use of force;

    b. Freedom from arrest without probable cause;

    c. Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiff was aware and did not consent;

    d. Freedom from the lodging of false charges against him by police officers;

    e. Freedom from having police officers fabricate evidence against him;

    f. Freedom from abuse of process;

    g. Freedom from malicious or sadistic state action upon the Plaintiff which shocks the conscience;

    h. Freedom from deprivation of liberty without due process of law; and

    i. The enjoyment of equal protection, privileges and immunities under the laws.

82. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

83. Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

84. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

85. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein.  Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights.  Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

86. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

87. The actions of the individual police defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which implemented by agents or employees of the NYPD, of employing wholly unprovoked and excessive force.

88. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

**FIFTH CLAIM**
**RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK**
**FOR STATE LAW VIOLATIONS**

89. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

90. The conduct of the individual defendants alleged herein occurred while they were on duty and/or in uniform, and/or in and during the course and scope of their duties and functions as New York City POLICE OFFICERS, and/or while they were acting as agents and employees of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant THE CITY OF NEW YORK is liable to plaintiff pursuant to the state common law doctrine of respondeat superior.

91. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**SIXTH CLAIM**
**ASSAULT AND BATTERY**

92. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

93. By the actions described above, defendants did inflict assault and battery upon plaintiff.  The acts and conduct of defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

94. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CLAIM
## FALSE ARREST AND FALSE IMPRISONMENT

95. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

96. By the actions described above, defendants caused to be falsely arrested or falsely arrested plaintiff, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

97. As a result of the foregoing, plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CLAIM
## ABUSE OF PROCESS

98. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

99. By the conduct and actions described above, defendants employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts.  The purpose of activating the process was intent to harm the plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to the plaintiff, which was outside the legitimate ends of the process.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

100.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**NINTH CLAIM**
**<u>INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>**

101.    The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

102.    By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

103.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

**TENTH CLAIM**
**VIOLATION OF RIGHT TO EQUAL PROTECTION OF LAW**

104.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

105.    By the actions described above, defendants violated the plaintiff's right to equal protection of law.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

**ELEVENTH CLAIM**
**NEGLIGENCE**

106.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

107.    The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to the plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

108.    As a result of the foregoing, the plaintiff was deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**TWELFTH CLAIM**
**NEGLIGENT HIRING, SCREENING, RETENTION,**
**SUPERVISION, AND TRAINING**

109.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

110.    Defendant THE CITY OF NEW YORK negligently hired, screened, retained, supervised, and trained defendants.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

111.    As a result of the foregoing, the plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

        WHEREFORE, the plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.    That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.    That he be awarded punitive damages against the individual defendants; and

c.    That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.    For such other further and different relief as to the Court may seem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

Dated:   New York, New York
         January 27, 2011

                                    Respectfully Submitted,

                                    /s/
                        By:    _____
                                    David B. Rankin (DR 0863)
                                    Law Office of Rankin & Taylor
                                    *Attorneys for the Plaintiff*
                                    350 Broadway, Suite 700
                                    New York, NY 10013
                                    t: 212-226-4507

29

/s/

By: _____

Lurie Daniel Favors, Esq.
Daniel Favors Law Group, P.C.
*Attorney for the Plaintiff*
305 Broadway, 14th Floor
New York, NY 10007
t: 347-967-7737
f: 212-659-0108